REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2634

September Term, 2015

_____

STATE OF MARYLAND

v.

STEPHANIE L. SMITH

_____

Graeff,
Reed,
Moylan, Charles E., Jr.
 (Senior Judge, Specially Assigned),


JJ.

_____

Opinion by Moylan, J.

_____

Filed: September 29, 2016

The key to our resolution of this State appeal was sounded 82 years ago by Supreme Court Justice Benjamin Nathan Cardozo:

> "[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

Snyder v. Massachusetts, 291 U.S. 97, 122, 54 S. Ct. 330, 78 L.Ed. 674 (1934).

## The Playing Field is Level

As we seek to answer Justice Cardozo's call "to keep the balance true," our attention turns in the case now before us to the contractual integrity of plea agreements. A plea agreement is, of course, a contract between a criminal defendant and the State in which each seeks to gain a benefit and, in return for such benefit, each agrees to pay a price. It is a very special contract, moreover, in that even after the basic quid pro quo is agreed upon by the primary contracting parties, the entire package may be submitted to a criminal court for its approval and its subsequent enforcement. If it should then be the enforcing authority (to wit, the court) that commits a breach of the contract, what even-handed justice requires is that each of the primary contracting parties, if suffering from the breach, is equally entitled to seek a remedy under equally conducive procedural conditions.

Defense counsel, however, adamantly insists that in a case such as this, the playing field is not level, because a criminal defendant in a state court enjoys the benefit of the Due Process Clause of the Fourteenth Amendment, whereas the State does not. When it comes to the entitlement to rely upon the contractual integrity of a plea agreement, however, any such distinction between the parties is a distinction without a difference.

Maryland has long recognized and enforced parity between the contracting parties to a plea agreement. As early as Sweetwine v. State, 43 Md. App. 1, 12, 398 A.2d 1262 (1979), aff'd, 288 Md. 199, 421 A.2d 60 (1980), this Court recognized the policy concerns that dictated that parity.

> "There is also a broad policy question at stake. If the prosecutor cannot rely upon the plea bargain, the potential 'chilling effect' upon the very institution of plea bargaining could be devastating."

State v. Sanders, 331 Md. 378, 385, 628 A.2d 209 (1993), also held "the court may impose a disposition more favorable to the defendant only if the parties agree." See also, Banks v. State, 56 Md. App. 38, 52, 466 A.2d 69 (1983) ("Thus, plea bargains have been enforced both against the State … and against defendants.") (emphasis supplied).

It was in Dotson v. State, 321 Md. 515, 517, 583 A.2d 710 (1991), that the Court of Appeals elaborated, as a statement of policy, on the indispensability of the plea-bargaining process to the operation of the criminal justice system.

> "The simple fact is that today plea agreements account for the disposition of an overwhelming percentage of all criminal cases. If this were not so, but rather every case entailed a full-scale trial, state and federal courts would be flooded, and court facilities as well as personnel would have to be multiplied many times over to handle the increased burden.
>
> ***
>
> "Additionally, plea agreements eliminate many of the risks, uncertainties and practical burdens of trial, permit the judiciary and prosecution to concentrate their resources on those cases in which they are most needed, and further law enforcement by permitting the State to exchange leniency for information and assistance. All in all, it is our view that plea bargains, when properly utilized, aid the administration of justice and, within reason, should be encouraged."

(Emphasis supplied).

In <u>Chertkov v. State</u>, 335 Md. 161, 174, 642 A.2d 232 (1994), the Court of Appeals picked up on the <u>Dotson</u> theme and made it absolutely clear that the State, when it relies upon the terms of a plea bargain, is as fully protected from a breach as is the defendant.

> "<u>That it was critical in Dotson that the violation of the plea agreement prejudiced the defendant does not mean that a violation of a plea agreement that prejudices the State is beyond the reach of principles of fairness and equity</u> or that the institution of plea bargaining cannot be adversely affected. <u>Just as a defendant would be loathe to participate in plea bargaining if he or she could not be certain that the bargain that he or she made would be fulfilled, so too would the State</u>. <u>There would be no incentive for the State to engage in plea bargaining</u> if it were possible for a defendant to enter into a binding plea agreement only to have the sentence contemplated by that agreement modified a short time later. <u>Nor would it be fair to the State, which is, after all, one of the parties to the agreement</u>."

(Emphasis supplied).

As announced in <u>Chertkov</u> and as reaffirmed in <u>Bonilla v. State</u>, 443 Md. 1, 12, 115 A.3d 98 (2015), the hydraulic forces undergirding parity for the State include not simply the practical policy concerns about the practice of plea bargaining but also principles of equity and fairness.

> "We do not agree that narrowly construing Rule 4-345(a) to conclude that sentences below binding plea agreements are legal would advance judicial economy. <u>Such interpretation</u>, moreover, <u>would require us to ignore the principles of fairness and equity and undermine the certainty that plea agreements provide</u>."

(Emphasis supplied).

The question of parity between the contracting parties to a plea agreement was squarely before the Court of Appeals in <u>Bonilla</u>.

> "This Court has 'held that a sentence which <u>exceeds</u> the sentence to which the parties agreed as part of a plea agreement is an illegal sentence within the meaning of Rule 4-345(a).' <u>In this case, we consider whether a sentence is illegal under Rule 4-345(a) when a sentencing court imposes a sentence below the sentence agreed to in a binding plea agreement without the State's consent</u>."

443 Md. at 3. (Underline emphasis supplied; footnote omitted). The answer of the Court of Appeals was unequivocally in favor of parity.

> "<u>[W]hen a sentencing court violates Rule 4-243(c)(3) by imposing</u>, without consent, <u>a sentence that falls below a binding plea agreement, the resulting sentence is inherently illegal under Rule 4-345(a)</u>."

443 Md. at 12. (Emphasis supplied).

Just as a defendant may enjoy the protection of the Due Process Clause, the State is protected by the principles of fairness and equity.

> "In <u>Cuffley</u>, we confirmed that '<u>fairness and equity govern the enforcement of plea agreements</u>.' As such, when the State and a defendant have entered a binding plea agreement, <u>each party is entitled to the benefit of its bargain. Concluding that sentences below binding plea agreements are legal</u> under Rule 4-345(a) <u>would be unfair to the State by depriving it of the benefit of its bargain</u>."

443 Md. at 12-13. (Emphasis supplied). Certainty is also a weighty consideration.

> "<u>For us to conclude that sentences below binding plea agreements are legal would undermine the certainty that plea agreements provide</u>.… Plea agreements play a crucial role in our criminal justice system because they provide certainty.… <u>The State and defendants would be discouraged from entering plea agreements if they could not be certain that sentencing courts will comply with binding plea agreements</u>."

443 Md. at 13. (Emphasis supplied).

A deviation downward from the terms of the plea agreement, therefore, is just as illegal as a deviation upward.

4

"[T]he sentences in this Court declared inherently illegal in <u>Dotson</u> and <u>Cuffley</u> exceeded the plea agreements. <u>Neither our reasoning nor our holding in those cases, however, suggest that striking a sentence as illegal can only occur when a sentence exceeds the terms of a binding plea agreement</u>. In both cases, we determined that <u>the sentences were illegal because</u> the <u>sentencing courts violated Rule 4-243(c)(3) by deviating from the binding plea agreements</u>."

443 Md. at 10. (Emphasis supplied).

Notwithstanding the one-directional character of the Due Process Clause, it is clear that with respect to reliance on the enforceability of a plea agreement, equity and fairness guarantee that what is sauce for the goose is also most definitely sauce for the gander. On that level playing field our analysis will now proceed.

Initially, let it be noted that there is no problem with the State taking an appeal from a sentence that is illegal in any way. <u>State v. Karmand</u>, 183 Md. App. 480, 488-92, 961 A.2d 1152 (2008). See also, <u>State v. Green</u>, 367 Md. 61, 76, 785 A.2d 1275 (2001); Maryland Code, Courts and Judicial Proceedings Article, § 12-302(c)(2)(i) and (ii).

## The Indictment

The appellee, Stephanie L. Smith, was indicted by the Grand Jury for Prince-George's County on September 10, 2015, on a charge of theft. Since a number of larcenous actions were perpetrated pursuant to one common scheme, the value of what was taken was aggregated for penalty purposes. Md. Code (2002, 2012 Repl. Vol.), Criminal Law Article ("CL"), § 7-103(f). The appellee was accordingly charged with the theft of property of the value of at least $10,000 but less than $100,000. The maximum penalty, pursuant to CL § 7-104(g)(ii) could have been imprisonment not exceeding 15 years or a fine not exceeding $15,000 or both.

5

## The Plea Negotiation

In the month that followed the indictment, the appellee, appellee's counsel, and the State entered into serious plea negotiations. Ultimately, a potentially binding deal was reached between the State and the appellee. The appellee agreed to offer a guilty plea to the primary theft charge, thereby giving up the chance of a not guilty verdict. What the appellee would get, in return, would be the guarantee that even the theoretical sentence would be one of no more than five years rather than a possible fifteen years. In terms of jail time or "hard time," moreover, all of the five year sentence would be suspended except for jail time of between 30 and 90 days, followed by five years of supervised probation. The appellee would also not be required to pay a fine, which theoretically could have been as high as $15,000.

For its part, the State gave up its chance of subjecting the appellee to 15 years of imprisonment and a $15,000 fine. What made the deal palatable to the State, however, was the guarantee of a conviction on the record and, as an important factor in theft scheme cases, guaranteed restitution to the victims in the amount of $47,460.02.

The binding nature of the deal, however, required the agreement of an additional party, the sentencing judge. Plea agreements are controlled by Maryland Rule of Procedure 4-243. The binding guarantee demanded by the appellee was not the mere gesture that the State would recommend that the judge impose the sentence suggested by the plea agreement with the perhaps illusory hope that the sentencing judge would do so. That sort of watered down plea bargain is the one contemplated by subsection 4-243(b), which provides:

"(b) **Recommendations of State's Attorney on sentencing.** The recommendation of the State's Attorney with respect to a particular sentence, disposition, or other judicial action made pursuant to subsection (a) (1) (E) of this Rule is not binding on the court. The court shall advise the defendant at or before the time the State's Attorney makes a recommendation that the court is not bound by the recommendation, that it may impose the maximum penalties provided by law for the offense to which the defendant pleads guilty, and that imposition of a penalty more severe than the one recommended by the State's Attorney will not be grounds for withdrawal of the plea."

(Emphasis supplied).

In this case, both the appellee and the State were only interested in a contract far more iron bound. Subsection (a)(1)(F) contemplates that the parties "will submit a plea agreement proposing a particular sentence, disposition, or other judicial action to a judge for consideration." As subsection (c)(2) and (3) spell out, the proposed agreement is not binding until the judge approves it but, once approved, it is binding on the judge:

"(2) Not binding on the court. The agreement of the State's Attorney relating to a particular sentence, disposition, or other judicial action is not binding on the court unless the judge to whom the agreement is presented approves it.
"(3) Approval of plea agreement. If the agreement is approved, the judge shall embody in the judgment the agreed sentence, disposition, or other judicial action encompassed in the agreement or, with the consent of the parties, a disposition more favorable to the defendant than that provided for in the agreement."

(Emphasis supplied).

## The Guilty Plea Hearing

The hearing for both the acceptance of the appellee's guilty plea and the imposition of sentence was held in the Circuit Court for Prince George's County on January 5, 2016. At the very outset of that hearing, the State presented for the consideration of the trial judge the terms of the plea agreement that the State and the appellee had reached.

"[PROSECUTOR]: It would be a plea to count 1, which is theft scheme greater than $10,000 but less than $100,000. In exchange for the guilty plea, there is a ceiling and a floor. The State would be allowed to argue for five years, suspend all but 90 days, five years supervised probation, and restitution in the amount of $47,460.00.02.

"THE COURT: $47,000.

"[PROSECUTOR]: $460.02. And the defense [is] free to argue for as little as five years, suspend all but 30 days, followed by five years supervised probation and also the restitution in the $47,460.02.

"[DEFENSE COUNSEL]: [Prosecutor], didn't we talk about I can ask for weekends?

"[PROSECUTOR]: That is correct. The defense is free to argue that she serve weekends. But, no, we didn't talk about home detention, just weekends."

The judge then confirmed that the State had agreed to nol pros other remaining counts in exchange for the appellee's guilty plea to the primary count. Attention then turned to the voluntariness of the guilty plea. After the judge told the appellee that he could impose a sentence of up to 15 years notwithstanding the plea agreement, the State at that point explained that the parties were contemplating that the court would bind itself to the terms of the agreement:

"[PROSECUTOR]: Your Honor, thank you. Just briefly, before that I have a housekeeping matter. I would like to add that despite the range, the 90 and 30 days, it is contemplated this would be a binding plea, therefore, it can only be modified in the future if both parties agree.

"THE COURT: Are you saying that if the Defendant is sentenced within the parameters of – first of all, are you asking the Court to bind itself to the five-year cap?

"[PROSECUTOR]: To the range.

"THE COURT: Ninety-day cap.

8

"[PROSECUTOR]: <u>Yes, sir</u>.

"THE COURT: <u>Or 30-day cap</u>.

"[PROSECUTOR]: <u>Yes</u>.

"THE COURT: <u>I have to hear the facts before I'm willing to do that</u>. Okay, number one. And number two, are you saying that the Defendant is prohibited from asking for reconsideration?

"[PROSECUTOR]: <u>No</u>. <u>They are not prohibited from asking</u>. <u>But before the motion can be granted, both sides would have to agree</u>.

(Emphasis supplied).

To determine whether there actually is an agreement between the State and a defendant, further to determine precisely what the terms of that agreement mean, to determine whether the trial judge signed on to that agreement, and finally to determine whether the agreement was breached are questions of law for the appellate court to decide <u>de novo</u>. <u>Cuffley v. State</u>, 416 Md. 568, 581, 7 A.3d 554 (2010) ("Whether a trial court has violated the terms of a plea agreement is a question of law, which we review <u>de novo</u>."); <u>Tweedy v. State</u>, 380 Md. 475, 482, 845 A.2d 1215 (2004) ("Whether a plea agreement has been violated is a question of law which we review <u>de novo</u>.").

## The Gene Kelly Two-Step

As we engage in our <u>de novo</u> determination, what precisely is it that we need to determine? It is the moment when the plea agreement reached by the parties became binding on the judge and thereby established both the legal cap and the legal floor for the sentence that followed. As we seek to pin-point that moment, the defense is hung up on a hyper-technicality of its own invention. It demands to know: "Did the judge ever say the

9

magic words 'Open, Sesame' and, if so, when precisely did he say them?" The defense perceives the problem in simplistic terms, "Which comes first, the judge's acceptance of the guilty plea or the judge's approval of the plea bargain? Which comes first, the chicken or the egg?" What the defense fails to appreciate is that the two judicial acceptances are intertwined parts of a single unfolding totality in which the two incipient acceptances may ripen simultaneously.

There would be no guilty pleas based on plea bargains if judges did not first, effectively speaking, agree to be bound by the terms of the plea agreements. There would be no realistic incentive for the defendant to accept the deal. Any suggestion that a guilty plea would be offered before the plea bargain has been at least conditionally accepted is an absurdity. Such an anticipatory acceptance of the deal by the judge is not, to be sure, an absolute or binding acceptance. It is a conditional acceptance. There is invariably the inevitable hedge, "It sounds reasonable to me, but first I must hear the facts," or, "If I am not surprised by some unexpected revelation, I will accept the terms of the plea agreement." In the vast majority of cases, there are no unexpected revelations and, in a subtle little two-step worthy of a Gene Kelly or a Fred Astaire, the conditional acceptance ripens into an absolute acceptance. Generally speaking, moreover, that subtle transition will not be announced to the audience by trumpets or kettle drums. See Tweedy v. State, 380 Md. 475, 483-84, 845 A.2d 1215 (2004), for the easy glide between conditional acceptances and absolute acceptances.

If the condition hedging the conditional acceptance is satisfied, the condition simply evanesces and the conditional acceptance has ripened into an absolute one. No magic words

10

are required. When the judge, after hearing the statement of supporting facts, starts talking in the language of the plea bargain, the plea bargain has self-evidently been accepted. There is a symbiosis between the two acceptances and it is impossible to say which, if either, came first. This transition should be discernible by the defense, even without kettle drums. In this case, it was discernible by us.

## Appellate De Novo Determinations

A brief word is in order about an appellate de novo determination, because it is an almost always critical procedural phenomenon. On the surface, it resembles in some respects nisi prius fact-finding, but it is not that. From a possible range of choices, fact-finding establishes an actual and concrete historic fact. Appellate de novo determinations do not. They establish, rather, the existence of a legal status or condition.

A de novo determination does not necessarily depend, moreover, on the determination's being a mathematical certainty or a logically ineluctable conclusion. Prior to the determination being made, opposing counsel might be able to make plausible arguments in either direction. The de novo determination, therefore, might go in either direction. Once made, however, the appellate de novo determination establishes a legal status controlling the case involved. The very existence of this procedural phenomenon raises interesting questions as to by what standard of review an appellate de novo determination might be challenged or might itself be subjected to higher appellate review. As an abstraction, might either of two opposing de novo determinations have been legally beyond challenge?

## Our <u>De</u> <u>Novo</u> Determination

As we engage in our <u>de novo</u> interpretation of this entire exchange among the judge, the prosecutor, defense counsel, and the appellee, it is clear to us that the judge had conditionally agreed to be bound by the terms of the plea agreement subject only to the ever present hedge that some dramatic and unforeseen fact not unexpectedly appear in the subsequent statement of supporting facts. The judge explained to the appellee the limits on the sentence that the plea bargain had imposed and that he, the sentencing judge, was prepared to follow. These were the terms that the judge announced and that the appellee accepted as she tendered her guilty plea.

> "THE COURT: <u>Okay, I see</u>. <u>Ms. Smith, the [State] is asking me to bind myself so I won't give you any more than 90 days jail time</u>. <u>So since that's coming from the State, that's something to consider</u>.
>
> "<u>The defense always wants the Court to bind itself to a fixed amount of time</u>. <u>Your attorney is asking for 30 days</u>. Naturally, <u>if I did accept this plea, I would take the higher amount, the 90 days</u>. The other thing, in other words, <u>five years suspend all but 90 days</u>. <u>You get five years but the most I could actually give you in terms of jail time at this time would be 90 days</u>. <u>But if you mess up on probation, because that's going to be five years, then the hammer falls and you get up to five years in prison</u>. <u>Do you understand that, ma'am</u>?
>
> "[SMITH]: <u>Yes</u>."

(Emphasis supplied). The only thing that was cast in conditional terms was the judge's acceptance of the guilty plea itself. "[I]f I did accept this plea."

In the tight sequence of events that followed, the State proceeded to recite for the record the summary of the evidence offered as a factual basis for the plea. The appellee agreed that the summary of the evidence was accurate. After confirming that the appellee

had no prior convictions and that no unexpected development would cause him not to go forward with the sentencing limitations previously agreed upon, the judge expressly and formally bound himself to the terms of the plea agreement.

> "That's helpful to know given that <u>I will accept this as an ABA plea</u>. <u>Which means</u>, Ms. Smith, <u>I agree to sentence you within the ranges recommended by the attorneys</u>. You want to explain that to her, [defense counsel], if that needs any explanation.
>
> "<u>In other words</u>, ma'am, <u>I'm not going to give you 15 years</u>. <u>The maximum penalty that I'm going to give you is five years</u>. <u>And I will suspend either all but 90 days or maybe 30 days</u>. I will consider weekends, but not necessarily weekends. But <u>I will order restitution in the amount of $47,460.02</u>. <u>You will be on five years['] supervised probation</u> and the main condition of that probation is that you pay this money back."

(Emphasis supplied).

It is hard to imagine how a judge's acceptance of a plea agreement could be more explicit than, "I agree to sentence you within the ranges recommended by the attorneys." An "ABA plea," moreover, is defined in the <u>Maryland Sentencing Guideline Manual</u> as a plea agreement that "is binding on the court under Maryland Rule 4-243(c)." Version 8.1, Page 3 (June 2016). On that basis, with the terms of the plea agreement expressly spelled out, the appellee confirmed her guilty plea.

> "THE COURT: Knowing that, ma'am, how do you wish to plead, guilty or not guilty?
>
> "[SMITH]: Guilty."

The acceptance of the guilty plea and the announcement of the conviction followed immediately.

> "THE COURT: The Court is satisfied the State has provided an adequate factual basis for me to accept [Smith]'s plea of guilty. I find that

13

her plea of guilty is freely, voluntarily made and with understanding of what she is doing. And the Court accepts her guilty plea and finds you guilty, ma'am, of Count 1 of the indictment in this case."

Our de novo interpretation of this entire exchange leads us to hold, as a matter of law, that the trial judge, prior to sentencing, had indisputably approved the plea agreement and bound himself to comply with its terms. Tweedy v. State, 380 Md. 475, 485, 845 A.2d 1215 (2004) ("Once the plea was accepted, the court was required to impose the agreed upon sentence, assuming that all the conditions imposed upon the defendant were fulfilled."); State v. Poole, 321 Md. 482, 497, 583 A.2d 265 (1991).

By way of future guidance, we are by no means suggesting that the judge's acceptance of the terms of the plea agreement did not vivify until that moment. We are simply holding, under the circumstances of this case, that his acceptance was already a fait accompli as of that moment.

**Breaching the Agreement**

There then followed, over the course of ten pages in the transcript, an examination, largely by the court, of the appellee's personal circumstances. This was appropriate because, pursuant to the plea agreement, it still had to be decided by the judge whether the jail time should be 30 days or 90 days or something in between. It was clear that the appellee made a very favorable impression on the judge. The judge was particularly concerned with the impact that the sentence might have on the appellee's continued employment. Without announcing his change of plans to either the prosecutor or defense counsel, the judge proceeded to impose sentence.

14

"THE COURT: <u>I'm going to give you a break</u>. The law allows me to keep this off of your record and give you jail time at the same time. <u>I want you to keep your job</u>. I think that is the most important benefit that you come with.

* * *

<u>I'm going to defer the imposition of sentence under [Md. Code, Criminal Law Article, §] 6-220</u>. But <u>you are still going to have to do jail time, 60 days. Now, I will make it on weekends</u> to be convenient to you, but you say you work on weekends."

(Emphasis supplied).

The sentence then handed down was one of Probation Before Judgment. Moments later, the court made a change in the sentence to benefit the appellee even further. "This deal is getting sweeter and sweeter for you, ma'am." The 60 days of actual detention were changed from jail time to home detention. As soon as he got the opportunity, the prosecutor sought a clarification as to the sentence and then voiced his objection to the departures from the terms of the plea agreement.

"[PROSECUTOR]: Your Honor, may I be heard, briefly? So the sentence, <u>I'm unclear, the sentence is probation before judgment</u>?

"THE COURT: <u>That is correct</u>.

"[PROSECUTOR]: <u>I don't want to be sour grapes, but when we were contemplating a binding plea agreement and now we have arrived at a sentence that doesn't represent anything with respect to the binding plea agreement. I wasn't prepared for this to go this direction</u>."

(Emphasis supplied).

The plea agreement had clearly specified that the appellee would be found guilty of a crime. The judge's sentence did not include a finding of guilty. Appropriately, the State appealed. The more lenient sentence was not with the consent of the prosecutor. In the

15

words of <u>Bonilla v. State</u>, 443 Md. 1, 11, 115 A.3d 98 (2015), "Rule 4-243(c)(3) prohibits a sentencing court from imposing a sentence below a binding plea agreement if the parties do not agree to the deviation." The sentence which fell below the floor established by the binding plea agreement was, therefore, clearly illegal.

### A Contention Out of Deep Left Field

Anticipating this possible holding, the appellee has pulled from her quiver no less than three <u>arguendo</u>-type alternative arguments. The first is that the State did not interrupt over the course of the approximately 10 pages of the transcript in which the judge was carefully explaining the conditions of the sentence to the appellee. The appellee seems to be saying that the State is thereby barred from objecting to the sentence because the State's objection came too late.

> "<u>By the time the prosecutor spoke up</u> and indicated, for the first time, that he was unhappy with the court's decision, <u>the sentence had already been imposed with his implicit consent and was thus not 'illegal.</u>'"

Appellee's Br. at 23. (Emphasis supplied).

The claim is without merit. The State's objection came immediately after the judge finished announcing the various terms of his sentence. The State sought immediate clarification and promptly announced its objection. The appellee seems to be chiding the State for not having interrupted the judge's announcement of his sentence. There is no statute, no rule of procedure, or no citation from caselaw offered in support of this sub-contention, and we know of none.

It is answer enough, however, to revert to our metaphor of the level playing field. Whatever time limitations are imposed on a defendant's right to challenge an inherently

16

illegal sentence because it does not conform to the terms of a binding plea agreement are obviously the time limitations controlling a similar challenge by the State as well. The time limit established by Maryland Rule of Procedure 4-345(a) is not nearly so unforgiving as that argued for by the appellee here. "An illegal sentence may be corrected at any time." The State did not waive its right to object to an illegal sentence by not having done so within the three-minute marker, nor will its three minutes of polite forbearance be deemed a consent on its part to the illegal sentence.

The second prong of this waiver/consent contention, boldly asserted but not argued further, would tilt the playing field precipitously:

> "[T]his Court must ask whether a reasonable defendant in Appellee's position would have understood that the State consented when the court imposed probation before judgment, and if it is ambiguous whether the State consented or opposed the disposition, the Court must resolve the ambiguity in Appellee's favor."

Appellee's Br. at 22. (Emphasis supplied).[1]

What does that say? It says that if the appellant (or her reasonable surrogate) during the three minutes that the judge, one on one, was explaining to her the terms of the sentence, believed that the State agreed with the sentence, then the State will be held to that position. The argument actually goes much further. It says that if there is even so much as ambiguity about what the appellee thought (perhaps because she had never thought about it), that ambiguity must be resolved by deeming the State to have consented. It would, therefore,

---

[1] This argument, moreover, extends, without any warrant for doing so, the potency of the defendant's reasonable expectations from the meaning of the plea agreement to the defendant's interpretation of the behavior of the State. That is quite a leap and one without any known precedent.

17

be futile for the State even to argue non-consent to the trial judge or to the appellate court unless and until it had persuaded the appellee (or her reasonable surrogate) to acknowledge affirmatively that the State had not consented. The appellee would be deciding whether the State had consented or not. Far from a level playing field, the State would thereby be scaling the Matterhorn. We reject such an argument.

## An Insidious Linguistic Villain: The Half-Truth

The basic flaw in the appellee's third contention is that she perceives this entire body of law as if it embraced nothing but challenges to sentences brought by criminal defendants. She fails to recognize that very different criteria are brought to bear when the challenge is brought by the State. She ignores the illegality of a sentence's falling below the mandatory floor simply because it did not exceed the mandatory ceiling. She looks at the issue of whether a sentence satisfied the terms of a plea agreement exclusively from a defendant's point of view and fails to recognize that there is another party to the plea bargain that also must be satisfied by the sentence.

It may be true that in certain situations, a defendant's understanding of a plea bargain may heavily influence or even control the meaning of the plea bargain. That, however, is not universally true. The contention, however, assumes that it is.

> "Even if this Court determines that the lower court bound itself to the plea agreement and that the State did not implicitly consent to the court's actions, the disposition is not an 'illegal sentence' because <u>a reasonable defendant in the appellee's position would not have understood the agreement to remove judicial discretion to impose probation before judgment after accepting the guilty plea</u>.
>
> "<u>A defendant's understanding of the plea agreement defines the plea agreement itself</u>."

18

Appellee's Br. at 24. (Emphasis supplied).

The appellee takes the one-sided view that a defendant would not, of course, be aggrieved by a sentence that was excessively in the defendant's favor, totally ignoring the fact that the other party to the contract, the State, might be very much offended.

> "In addition to the plea agreement being silent as to probation before judgment and a general provision of the Maryland Code allowing it, <u>a reasonable defendant in Appellee's situation would not have thought the disposition contravened the proposed plea agreement</u> because the court's express purpose in suspending the sentence was to allow Appellee to keep her job so she could pay off the restitution."

Appellee's Br. at 26. (Emphasis supplied). The appellee would thereby be deciding whether the sentence was or was not illegal.

The appellee finally boldly asserts that the defendant's understanding of the plea bargain defines the plea bargain itself.

> "Because <u>a defendant in this circumstance would not think the plea agreement precluded probation before judgment</u>, and because <u>the defendant's understanding of the agreement defines the agreement itself</u>, this Court should find that the proposed plea agreement did not remove the lower court's ability to impose probation before judgment pursuant to Md. Code, Crim. Proc. § 6-220(b)(1) for the express purpose of allowing Appellee to stay employed and make restitution payments."

Appellee's Br. at 28. (Emphasis supplied).

Such an argument is simply wrong. The argument, however, wrong as it may be, has a psychological basis that is worthy of examination. Such an examination, moreover, provides insight into the central theme of this opinion, the concept of the level playing field. It may also shed light on a common fallacy in much legal reasoning, the taking of an

19

uncontroversial statement from a limited context but then proffering the partial truth as a universal truth applicable to all contexts. This is the linguistic demon of the half-truth.

The body of law that has been only recently developing around the issue of inherently illegal sentences because of non-compliance with legally binding plea agreements is particularly vulnerable to this danger of half-truths. The examination of sentences for inherent illegality essentially only began with Mason v. State, 46 Md. App. 1, 415 A.2d 315 in 1980 and Walczak v. State, 302 Md. 422, 488 A.2d 949 in 1985. The factor of a negotiated plea agreement approved by the trial judge was only introduced into the equation in 2010-2012 with Cuffley v. State, 416 Md. 568, 7 A.3d 257 (2010); Baines v. State, 416 Md. 604, 7 A.3d 578 (2010); and Matthews v. State, 424 Md. 503, 36 A.3d 499 (2012). From the beginning, the overwhelming majority of the cases, if not all of them, were challenges to sentences brought by defendants because the sentences were allegedly in excess of an upper limit established by an allegedly binding plea agreement. Indeed, the first square challenge to a sentence brought by the State was Bonilla v. State, 443 Md. 1, 115 A.3d 98 as late as 2015.

Although it was always logically foreseeable that the body of law would be as readily available to the State as to criminal defendants and although Bonilla v. State indisputably so held in 2015, the quantitative dominance of defendant-generated challenges inevitably meant that the caselaw would reflect that one-sided tilt. The opinions spoke of the defendant's rights, the defendant's entitlements, and the defendant's reasonable expectations because those were the only issues then before the Court. There was no necessary mention of the State's rights, the State's entitlements, and the State's

20

expectations, because there were no issues involving such things calling for decision. The half-truth that was mentioned was correct as far as it went, but it obviously did not embrace the full truth.

Since <u>Bonilla</u>, it is now perspicaciously clear that a sentence is inherently illegal if it 1) exceeds the maximum set by the plea agreement <u>OR</u> 2) falls below the minimum set by the plea agreement. For the 35-year life of this body of law, however, almost all (if not, indeed, all) of the definitions of sentencing illegality in the opinions mentioned the sentencing ceiling but failed to mention the sentencing floor, not because the floor did not exist but for the very obvious reason that the ceiling was the only issue before the Court in the cases then being decided. The non-mention of the sentencing floor by no means implied the non-existence of the sentencing floor. This overwhelming tilt in the procedural posture of the cases created a promiscuous seedbed for the use and quotation of half-truths. They abound in the present case.

The caselaw reflects a benign deference toward a non-lawyer criminal defendant who has given up his right to a trial in return for what he reasonably believes he has bargained for. The statements of deference in many opinions, however, have been made in the procedural context of challenges to sentences brought by defendants claiming that they did not get what they had bargained for. When the appellee in the present case quotes such law, however, she attempts to bedazzle us with a half-truth. Is the law quoted by the appellee false? No! It is perfectly true – in the procedural context in which it was said. When the appellee takes it out of that context, however, and attempts to insert it into a very different procedural context, one wherein the State is claiming that it did not receive the

21

thing it had bargained for, the half-truth has run out of truth. It is simply inapplicable to a very different procedural situation. Cogency depends not only on what the words say but on the context in which they are said. As its numerator should signal, a half-truth has its limits.

When, in a challenge to a sentence brought by the State, our focus is on whether the State got what it had a right to expect pursuant to a plea agreement, what the appellee may or may not have thought about it is totally immaterial. If a sentence is illegal, as in <u>Bonilla</u>, because it fell below the mandatory floor bargained for in the plea agreement, the appellee cannot make it legal by putting her interpretive seal of approval on it. To say that the plea agreement meant whatever the appellee thought that it meant is ridiculous. That would empower the appellee to decide the case.

### Beware The Half-Truth!

Our reading of this unexpected scenario at the time of sentencing is that the judge was not, in the first instance, refusing to follow the terms of the plea agreement. He had already accepted them as he affirmed the adequacy of the supporting statement of facts and thereby accepted both the guilty plea and the terms of the plea agreement in a single omnibus acceptance. <u>See</u> <u>Banks v. State</u>, 56 Md. App. 38, 47-48, 466 A.2d 69 (1983) (The guilty plea and the plea agreement must be viewed as a part of a "whole package of reciprocal arrangements and obligations."); <u>Sweetwine v. State</u>, 42 Md. App. 1, 4, 398 A.2d 1262 (1979); <u>aff'd</u> 288 Md. 199, 421 A.2d 60 (1980). As he subsequently extended unplanned and unnegotiated leniency toward the appellee, we do not think the judge was consciously breaching the agreement because, as we have discussed, leniency toward a

22

defendant is such a relatively rare example of such breaches that its very status as a breach could easily be overlooked. If the judge had been conscious of such a breach, moreover, he would unquestionably have responded to the clear direction of Rule 4-243(c)(4), which requires that "[i]f the plea agreement is rejected, the judge shall inform the parties of this fact." There was no remote suggestion to the State that the court was departing from the terms of the plea agreement. See Tweedy v. State, 380 Md. at 484-85.

It is quite possible (it even seems likely) that the trial judge did not realize that his sentence was in conflict with the terms of the plea agreement. Such a blind spot would be readily foreseeable from the fact that almost all of the caselaw speaks only of a defendant's rights and a defendant's expectations, which obviously were not offended by the PBJ in this case. The overwhelming mass of the caselaw, moreover, gives only the one-sided definition of sentence illegality, to wit, a sentence that exceeds the cap agreed to by the plea bargain. The PBJ obviously did not exceed any sentencing cap. There may thus have been no realistic reason to suspect that a more lenient sentence would in any way offend prevailing law or even require a comment in that regard.

The standards and criteria that are pertinent when a defendant is the allegedly aggrieved party may, legitimately, be called the general rule, simply because challenges by defendants constitute the overwhelming majority of the cases. The standards and criteria that are pertinent when the State is the allegedly aggrieved party are, in a sense, exceptional, but only because challenges by the State are much, much rarer. It is readily understandable that one could be keenly aware of the general situation but not immediately alert to the exceptional situation.

The appellee has accurately quoted standards that are applicable when a defendant is the allegedly aggrieved party, while totally ignoring the diametrically different procedural posture that in this case, it is the State which is the allegedly aggrieved party. Most swans, indeed, are white, but there is such a thing as a black swan. Be careful, therefore, of too much talk about white swans in a black-swan case. Beware the half-truth!

**Is A Non-Conviction Better For The Defendant Than A Conviction?**

Of course it is! The appellee's last contention will not detain us long. She claims that, when she got PBJ instead of a conviction, that did not represent a disposition more favorable to her and was not, therefore, an occasion for the State to appeal. We find it hard to agree. The disadvantages of a conviction, above and beyond incarceration, are self-evident – possible enhanced sentencing if convicted again, possible deportation, possible loss of the right to vote, disqualification for public office, possible loss of employment (as the judge articulated in this case), the rejection of one's application to the country club. The consequences may be myriad, large and small. The debilitating stigma of conviction is harmful in and of itself. In negotiating a plea agreement, of course, the criminal defendant and the State are in adversarial roles. What is bad for the defendant is generally good for the State; what is good for the defendant is generally bad for the State. The adversarial arguments will be essentially mirror images of each other.

The answer to many a contention in this area becomes more readily apparent if hypothetically we reverse the roles of the parties and the circumstances. Imagine, for example, a criminal defendant who, in exchange for a plea of guilty, has bargained for a PBJ instead of a conviction. Imagine then his chagrin if the judge unexpectedly announces

24

a conviction instead of the PBJ. The question as to whether that hypothetical defendant would have a legitimate grievance, of course, answers itself. On a level playing field, moreover, the reverse surprise – a PBJ instead of a conviction – would <u>ipso</u> <u>facto</u> present the State with an equally cognizable grievance, as it has in this case. This body of law is a two-way street.

## Conclusion

As a practical matter, Maryland courts have only been adjudicating the inherent illegality of criminal sentences since 1980. More particularly, they have only been adjudicating the issue of sentences being inherently illegal because they fail to conform to binding plea agreements since 2012. Most of the adjudicated cases, generally pursuant to Maryland Rule of Procedure 4-345(a), have been cases brought by defendants to vindicate a defendant's right not to receive a sentence in excess of the sentencing cap established by a plea a bargain. <u>Bonilla v. State</u> in 2015 was the first appellate opinion to view the problem squarely from the perspective of the other contracting party to the plea negotiation – the State. Taking into consideration both perspectives, the conclusion is clear that both of the contracting parties to a binding plea agreement – the defendant and the State – will contest with each other about the plea agreement on a level playing field. On that level playing field, the State prevails.

**JUDGMENT REVERSED. CASE REMANDED FOR RESENTENCING. COSTS TO BE PAID BY APPELLEE.**

25